# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ROSANN DELSO, | : | Civil Action No. 04-3009 (AET) |
|  | : |  |
| Plaintiff, | : |  |
|  | : | **OPINION AND ORDER** |
| v. | : |  |
|  | : |  |
| TRUSTEES FOR THE RETIREMENT | : |  |
| PLAN FOR THE HOURLY | : |  |
| EMPLOYEES OF MERCK & CO., | : |  |
| INC., | : |  |
|  | : |  |
| Defendant. | : |  |

**Bongiovanni, Magistrate Judge**

Presently before the Court is a motion by Defendant Hourly Pension Committee, incorrectly pleaded as the "Trustees of the Retirement Plan for the Hourly Employees of Merck & Co., Inc.," (hereinafter "Defendant" or "Committee") to disqualify Richard E. Shapiro, Esq., (hereinafter "Shapiro") as counsel for *pro se* Plaintiff Rosann Delso (hereinafter "Plaintiff" or "Delso") and to prevent Shapiro from representing Plaintiff in either a formal or informal manner. Defendant filed its Motion to Disqualify and supporting brief [Docket Entry No. 42] on August 23, 2006 (hereinafter "Moving Brief"). Shapiro submitted a brief in opposition [Docket Entry No. 52] on October 2, 2006 (hereinafter "Shapiro Opposition")[1], and Plaintiff submitted her opposition [Docket Entry No. 53] on October 4, 2006 (hereinafter "Delso Opposition"). Defendant filed its reply brief [Docket Entry No. 57] on October 30, 2006 (hereinafter "Reply Brief"). No oral argument was held pursuant to Fed.R.Civ.P. 78. For the following reasons Defendant's Motion is GRANTED in part and DENIED in part.

---

[1] The Court notes that Shapiro was permitted to submit a brief on his own behalf in opposition to Defendant's motion even though he has not entered an appearance in this matter.

## I.  INTRODUCTION

The factual information relevant to the instant motion involves two distinct series of facts which culminated in Shapiro "informally assisting" Plaintiff in this matter.  For clarity, the Court shall review the factual history of Shapiro's relationship with the Paper, Allied-Industrial, Chemical and Energy Workers International Union ("PACE"), the events leading up to the filing of the Complaint by Plaintiff, and Shapiro's interaction with Plaintiff.

### a.  Shapiro

In February 1999, Shapiro was retained by the PACE, Local 2-575 ("Union").  (Shapiro Opposition at 5).  The Union was based at the Rahway, New Jersey site of Merck & Co.  In this capacity Shapiro represented the Union and individual union members in various arbitration proceedings.  (Id.).  Shapiro also represented the Union in collective bargaining negotiations with Merck and in litigation arising from arbitrations.  (Id.).  Shapiro never represented other local PACE unions, and in October 2003, he ceased working for the Union.  (Id.).

During the course of his representation of the Union, Shapiro interacted with Guy Fleming, ("Fleming"), the Union President and member of the Committee.  (Id. at 6).  After discussions with Fleming, Shapiro became aware that Fleming was a participant in the management of the Committee.  (Id.).  Shapiro, however, certifies that he was unaware of the nature of the responsibilities of the Committee or of any matters related to general Committee activities.  (Id.).  Shapiro also certifies that he never had any discussions with Fleming regarding "any matters relating to [Fleming's] decisions or responsibilities on the Committee" with the single exception of "[Fleming's] decision on Plaintiff's application."  (Id. at 7).  Further, Shapiro certifies that he never received any confidential information from Fleming regarding Committee activities, and that Fleming never advised Shapiro on any matters related to individual claims.  (Id.).

2

At some point in mid-2001 the Union requested that Shapiro seek information about the application process for disability retirement benefits on behalf of the Union.  (Id.).  Shapiro asserts that this was a result of the Union members being confused about the application process.  (Id.).  In seeking information, Shapiro sent a letter to Merck requesting information on the application process for disability retirement benefits.  (Id. at 8).  Shapiro advised Merck that he was seeking information on the application process on behalf of Fleming and other members of the Union who were participants in the Merck's Hourly Employees Retirement Plan (hereinafter "Retirement Plan").[2]  (Id.)  Shapiro received a response dated May 24, 2001, from Bruce Ellis, Assistant Counsel for Merck Employee Benefits and Executive Compensation, responding to Shapiro's inquiries and noting a potential conflict with Shapiro's representation.  (Id. at 8-9).  Shapiro asserts that Mr. Ellis's claim of any potential conflict of interest was unwarranted because Shapiro was not representing Fleming as a member of the Committee.  (Id. at 9).

**b. Delso**

Plaintiff is the widow of James Delso (hereinafter "Decedent"), who was an employee of Merck & Co., Inc., at its Rahway, New Jersey facility for over thirty one years, and a participant in the Retirement Plan.  (Complaint at ¶ 8).  On December 23, 2002, Decedent suffered a heart attack after being hospitalized for pneumonia earlier that day.  (Id. at ¶ 10).  On December 26, 2002, Decedent passed away while in the hospital.  (Id. at ¶ 8).  Plaintiff filed paperwork with Defendant seeking disability retirement benefits in the form of a lump sum payment.  (Moving Brief at 2).  On March 6, 2003, Defendant voted to deny Plaintiff's request.  Defendant, subsequently denied

---

[2]   The Retirement Plan is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*  (Moving Brief at 2).  The Committee consists of both union and salaried employees and interprets provisions of and makes determinations of claims made under the Retirement Plan.  (Id.)

Plaintiff's appeal.  Shapiro represented the Union when Plaintiff's request and appeal were denied. (Id. at 11).  Moreover, Fleming was a member of the Committee when the original claim and appeal were denied and when the instant suit was filed on June 28, 2004. (Id. at 2).

At the date of the filing of the Complaint, Plaintiff was represented by the law firm of Markowitz & Richman (hereinafter "M&R").  (Shapiro Opposition at 9).  M&R succeeded Shapiro as counsel for the Union around October 2003, and was continuing to represent the Union when they filed Plaintiff's Complaint.  (Id. at 9).  In the eyes of Defendant, M&R's representation of Plaintiff was in conflict with its representation of the Union because Plaintiff's interests were "materially adverse" to the interest of the Union members.  (Id. at 3).  On August 23, 2004, Defendant informed M&R of what they viewed to be a potential concurrent conflict of interest, and the firm withdrew. (Id.)[Docket Entry No. 10].  As a result of M&R's withdrawal, the Court gave Plaintiff the option to either obtain new counsel or to proceed with the action *pro se*.  (Id.).  Unable to retain counsel to represent her, Plaintiff made the decision to move forward on her own.  (Shapiro Opposition at 9-10).

**c. Shapiro's Representation of Delso**

Plaintiff was granted time to retain new Counsel between March and June 2005. [Docket Entry Nos. 10-14].  On March 15, 2005, the Court received a facsimile message from Plaintiff, advising that she had "provided Mr. Richard Shapiro, 609-919-1888 with the information about the case and he is reviewing the information to determine if he will take the case or not." (March 15, 2005 Facsimile to Court).  Plaintiff also requested the Court's guidance regarding a telephone conference scheduled for March 15, 2005.  (Id.).  In light of the possibility of Plaintiff retaining Shapiro, the Court adjourned the telephone conference until March 21, 2005 at 9:30 A.M.  The March 21, 2005 telephone conference included Plaintiff and Counsel for Defendant. During the

4

telephone conference the Court responded to Plaintiff's March 15, 2005 letter:

> COURT:      [...] I'm sure [my courtroom deputy] explained to you that we were in contact with [...] Mr. Shapiro, who you had spoken to recently Ms. Delso, to see if you could retain him as counsel...
>
> MS. DELSO:  Right....
>
> COURT:      ... and apparently he did his conflict search and he does have a conflict, so he indicated that he won't be able to represent you.  I don't know if you had an opportunity to talk to him or if this was news to you when we called you today.
>
> MS. DELSO:  No. No. I did speak with him on Friday afternoon.
>
> COURT:      Ok, what's your game plan?
>
> MS. DELSO:  Um ... I am in the process of trying to get another attorney, um..., and...
>
> COURT:      Have you talked to someone else already, or do you have another name?
>
> MS. DELSO:  Not since Friday no.
>
> COURT:      Do you have another name of someone you think you're going to go to?
>
> MS. DELSO:  No, I was calling a friend of mine and asking her help.

(Audio Recording of March 21, 2005 Telephone Conference (unofficially transcribed for purposes of this Opinion only)[Docket Entry No. 12]).  Delso was afforded additional time to retain counsel.  During a telephone conference with the Court on June 20, 2005, Plaintiff indicated that she would be moving forward in this matter *pro se*.  (Audio Recording of June 20, 2005 Telephone Conference [Docket Entry No. 14]).  A Scheduling Order was issued on June 20, 2005, setting a briefing schedule for cross motions for summary judgment. [Docket Entry No. 15].

On September 9, 2005, Defendant filed a cross motion for summary judgment. [Docket Entry No. 16]. Plaintiff submitted an unsigned letter dated September 8, 2005, and received by the Court on September 12, 2005, which outlined her position regarding the case. [Docket Entry No. 17-1]. The Clerk of the Court responded to Delso, outlining that letters to the Court must be signed and if the letter was intended as opposition to Defendant's Summary Judgment Motion it should have been titled so. [Docket Entry No. 17-2]. Delso submitted a similar letter on September 20, 2005, titled "Plaintiff's Opposition to Defendant's Summary Judgment Motion". [Docket Entry No. 20]. Soon thereafter, on September 23, 2005, Plaintiff submitted a letter requesting a two week extension to submit an opposition to Defendant's motion. [Docket Entry No. 21]. The District Court granted the extension and Plaintiff filed a Brief in Opposition to Defendant's Motion for Summary Judgment and supporting affidavits. [Docket Entry Nos. 22-28].

Shapiro asserts that soon after Defendant filed its summary judgment motion he was approached by Fleming, who inquired if Shapiro could assist Plaintiff in finding an attorney to help her respond to the motion. (Shapiro Opposition at 10). Although Fleming was a member of the Defendant Committee at the time that Plaintiff's claim was denied, when he approached Shapiro he was no longer president of the Union, nor a member of the Defendant Committee. (Id.) Shapiro agreed to seek out counsel for Plaintiff, but was unable to find appropriate representation and therefore agreed to "informally assist" her with legal research and with the preparation of written submissions. (Id. at 11). Shapiro certifies that he only agreed to provide such informal assistance after Plaintiff repeatedly stated that she had no desire to pursue legal action against the Union, Fleming, or any individual member of the Committee. (Id.).

Subsequently, Delso made several submissions to the court that, according to Defendant, suggested that she was assisted by an attorney familiar with ERISA and general litigation. (Moving

6

Brief at 3).  In late October 2005 the parties mutually withdrew their cross motions for summary judgment [Docket Entry Nos. 29 and 30] and a discovery schedule was set. [Docket Entry No. 31]. During a November 3, 2005 Telephone Conference with the Court, Plaintiff advised that she was receiving assitance from Shapiro. [Docket Entry No. 31].

> MS. KNEPPER: My client would like to know who is providing counsel for Ms. Delso.  She is appearing *pro se*, but her papers were not written *pro se*, the issue being that we were on the eve of filing a disqualification application and to the extent that the attorneys are involved in this matter that have a conflict of interest, we believe we have a right to that information.
>
> COURT: Ms. Delso, is there someone that you are conferring with that you want to disclose to us?
>
> MS. DELSO: Sure, right now ... well ... I'm not referring ... He's just giving me help or telling me ... helping me fill out my paperwork because I was very confused, and it is Richard Shapiro.
>
> MS. KNEPPER: I believe and I'll check with my client ... I believe that Mr. Shapiro was one of the attorneys that Mrs. Delso had sought representation from in the past, that did not take the case because of a conflict of interest.

(Audio Recording of November 3, 2005 Telephone Conference (unofficially transcribed for purposes of this Opinion only)[Docket Entry No. 31]).[3]  The Court then gave Defendant permission to file any necessary motions for disqualification. (Id.). Soon thereafter, Plaintiff filed an Informal Motion to Compel discovery, which was denied on March 30, 2006 [Docket Entry No. 33].  The denial was appealed and remanded.

---

[3] The Court notes that Shapiro certifies that he advised Delso to be forthright with the Court that she was receiving informal legal assistance from Shapiro.  (Shapiro Opposition at 12).

On June 6, 2006, Defendant received correspondence purportedly from Plaintiff, but signed by another individual. (Moving Brief at 4). This correspondence was sent in an envelope bearing the return address of Shapiro's law office. (Id.). In response, Defendant drafted a letter to Shapiro indicating their displeasure with his behavior and informing him of their intention to bar his participation in the current action. (Shapiro Opposition at 12). Shapiro responded to the Defendant's allegations in a June 12, 2006 letter addressed to the Court in which he confirmed that he had been assisting Plaintiff in this matter. (Moving Brief at Ex. 4).

On August 23, 2006, Defendant filed the instant Motion to Disqualify as a means to have Shapiro barred from assisting or representing Plaintiff in this matter in either a formal or informal capacity. Defendant argues that Shapiro is barred from proving any further legal assistance because his involvement violates The New Jersey Rules of Professional Conduct, and because Shapiro has engaged in ghostwriting in violation of his ethical obligations as an officer of the court.

## II.  DISCUSSION

### A.  New Jersey's Rules of Professional Conduct

As the Supreme Court of New Jersey noted, "the Code of Professional Responsibility is not designed for Holmes proverbial 'bad man' who wants to know just how many corners he may cut, how close to the line he may play, without running into trouble with the law. Rather, it is drawn for the 'good man' as a beacon to assist him in navigating an ethical course through the sometimes murky waters of professional conduct." Reardon v. Maralyne, Inc., 83 N.J. 460, 469 (1980) (quoting General Motors Corp. v. City of New York, 501 F.2d 639, 649 (2d Cir. 1974)(internal quotations omitted)). The United States District Court for New Jersey has taken a similar approach through its adoption of the Rules of Professional Conduct (hereinafter "RPC") as revised by the New Jersey Supreme Court. L.Civ.R. 103.1(a). See also Home Care Industries, Inc. v. Murray, 154 F. Supp.

8

2d 861, 865-655 (D.N.J. 2001).  When interpreting the RPC, the Court looks to New Jersey's state courts' interpretation of the RPC as primary authority and modifies it when required by federal law. Steel v. General Motors, Inc., 912 F. Supp. 724 (D.N.J. 1995).  When considering a motion to disqualify counsel, the movant bears the burden of proving that disqualification is appropriate because the RPC was violated.  Maldonado v. New Jersey, 225 F.R.D. 120, 136-137 (D.N.J. 2004). In addition to clients, adversaries have standing to raise conflict of interests issues.  Essex County. Jail Inmates v. Treffinger, 18 F. Supp. 2d 418, 431 (D.N.J. 1998).  Generally speaking, motions to disqualify are viewed with disfavor as disqualification is a drastic remedy with broad, sometimes devastating implications.  Carlyle Towers Condominium Ass'n v. Crossland Sav., 944 F. Supp. 341, 345 (D.N.J.1996).  Nevertheless, if there is any doubt as to the propriety of an attorney's representation of a client, such doubt must be resolved in favor of disqualification.  Maldonado, 225 F.R.D. at 136-137; See also Kaselaan & D'Angelo Assoc., Inc. v. D'Angelo, 144 F.R.D. 235, 238 (D.N.J.1992).  Defendant asserts that Shapiro violated RPC 1.7 and 1.9, and therefore should be disqualified from representing Plaintiff in this matter.

New Jersey's courts have held that "[o]ne of the most basic responsibilities incumbent on a lawyer is the duty of loyalty to his or her clients.  From that duty issues the prohibition against representing clients with conflicting interests." Matter of Opinion No. 653, 132 N.J. 124, 129 (1993); Accord Opinion 682 of the Adv. Comm. on Prof. Ethics, 147 N.J. 360, 368 (1997).  This has been codified in RPC 1.7, which provides that "[a]n attorney owes his client undivided loyalty and allegiance." Kramer v Ciba-Geigy Corp., 371 N.J. Super. 580, 598 (App.Div. 2004).  Specifically, "RPC 1.7 Conflict of Interest: General Rule,"  provides:

> (a)  Except as provided in paragraph (b), a lawyer shall not represent
> a client if the representation involves a concurrent conflict of interest.
> A concurrent conflict of interest exists if:

> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.

> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

> (1) each affected client gives informed consent, confirmed in writing, after full disclosure and consultation, provided however, that a public entity cannot consent to any such representation. When the lawyer represents multiple clients in a single matter, the consultation shall include an explanation of the common representation and the advantages and risks involved;
>
> (2) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>
> (3) the representation is not prohibited by law; and
>
> (4) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

RPC 1.7. If an attorney is found to have represented conflicting interests in violation of the RPC's, he or she may be subject to discipline by the Supreme Court of New Jersey. See e.g. In re Pena, 162 N.J. 15 (1999); Matter of Porro, 134 N.J. 524 (1993); Matter of Berkowitz, 136 N.J. 134 (1994).

The broad language of RPC 1.7 regarding conflicts of interest is narrowed in some of the subsequent rules. For example, conflicts are not limited to the simultaneous representation of clients, but may exist due to representation of former clients. RPC 1.9; See also Kramer v. Ciba-Geigy Corp., 371 N.J. Super. at 598. This principle is outlined in subsection (a) of RPC 1.9 "Duties

10

to Former Clients":

> (a)   A lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing.

RPC 1.9(a).  Simply stated, an attorney cannot represent a client whose interests conflict with the interests of a former client in a substantially similar matter without written consent of the former client.

For over fifty years, courts have used a test to gauge whether an attorney should be disqualified due to the existence of a conflict under RPC 1.9.  Bagdan v. Beck, 140 F.R.D. 660, 668 (D.N.J. 1991)(citing T.C. Theater Corp. v. Warner Brothers Pictures, Inc., 113 F. Supp. 265 (S.D.N.Y. 1953)).  This test is more commonly known as the "substantial relationship test" and consists of three prongs[4], identical to RPC 1.9(a),  all of which must be satisfied before an attorney may be disqualified by the Court. Id.; Home Care Indus., 154 F. Supp. 2d 861, 866.  Accordingly, a movant must establish (1) the existence of a past attorney client relationship involving the attorney sought to be disqualified, (2) that the current representation involves the same or a matter substantially related to the former representation, and (3) that the interests of the attorney's current client are materially adverse to the interests of the former client.  Home Care Indus., 154 F. Supp. 2d at 866;  Host Marriott Corp. v. Fast Food Operators, Inc., 891 F. Supp. 1002, 1007 (D.N.J. 1995);  Bagdan, 140 F.R.D. at 668; Rohm & Haas Co. v. American Cyanamid Co., 187 F. Supp. 2d 221, 228 (D.N.J.2001).  Where the moving party has established that the matters are substantially related, the court will presume that the attorney has acquired confidential information from the

---

[4]   The Court notes that the fourth prong, an analysis of whether there is an appearance of impropriety was abolished with the 2004 revisions to the RPC. Cf. N.J. Advisory Comm. on Professional Ethics Op. 654 (October 17, 1991).

former client relevant to the current proceeding.  Reardon, 83 N.J. at 469.

However, the substantial relationship test is not implicated until the movant shows that the "attorney was in a position where he could have received information which his former client might reasonably have assumed the attorney would withhold from his present client." Host Marriot, 891 F. Supp. at 1007.  In the instant matter, there is no indication from the parties' submissions that Shapiro's representation of the Union put him in the position of receiving information which the Union would assume that he would withhold from Delso.  In fact, Shapiro certifies that he "never received any confidential information from Mr. Fleming relating to the Committee."  Shapiro Certification at ¶ 6. However, because neither a formal agreement for representation exists between Shapiro and Delso, nor has Shapiro entered an appearance on behalf of Delso, the Court finds it prudent to delve further into the arguments presented by the parties.

Given the unique set of facts in the instant matter the Court shall parse the substantial relationship test and evaluate an additional factor.  Specifically, the Court shall first look for (1) the existence of an attorney client relationship between the *pro se* litigant and the attorney sought to be disqualified, and then examine (2) the existence of a past attorney client relationship involving the attorney sought to be disqualified, (3) that the current representation involves the same or a matter substantially related to the former representation, and (4) that the interests of that attorney's current client are materially adverse to the interests of the former client. See generally Home Care Indus., 154 F. Supp. 2d at 866 (emphasis added).  The Court adds this additional factor because the plain language of RPC 1.9(a) assumes that an attorney-client relationship exists between the attorney whose disqualification is sought, and the litigant for whom the legal services are to be performed.[5]

---

[5] The deficiencies in the RPC as they currently exist for addressing situations where attorneys limit the scope of the legal services provided to a litigant are discussed in more detail *infra* at page 22.

It follows, that the lack of a current attorney-client relationship would result in a conclusion that RPC 1.7 and 1.9 are not violated.  Moreover, the Court shall address Defendant's arguments that Shapiro should be disqualified because of an appearance of impropriety.

    *1.  Existence of a current attorney client relationship*

The first question is whether an attorney-client relationship exists between Shapiro and Delso.  In a large majority of cases, the existence of an attorney client relationship is clear and thus, to question its formation is not part of the substantial relationship test.  However, in the instant matter, Shapiro has neither entered an appearance on behalf of Delso, nor stated that he represents her.  Therefore, to determine whether a conflict of interest that warrants disqualification exists, the Court must first determine whether an attorney-client relationship exists between the attorney and *pro se* litigant.

    The New Jersey Supreme Court has held that the attorney-client "relationship is inherently an aware consensual relationship, one which is founded upon the lawyer affirmatively accepting a professional responsibility."  In re Palmieri, 76 N.J. 51, 58 (1978)(internal quotations omitted).   In other words, the attorney-client relationship begins with a non-lawyer's reliance on the professional skills of an attorney, who, in turn, knows of this reliance and accepts responsibility for it.  Id.; See also Dixon-Ticonderoga Co. v. Estate of O'Connor, 248 F.3d 151, 169 (3d Cir. 2001).   The relationship must be a mutually aware, consensual relationship.  Ibid.  The client must demonstrate from an identifiable action or manifestation, reliance on an attorney in his professional capacity.  Herbert v. Haytaian, 292 N.J.Super. 426, 436-37 (App.Div.1996). To complete the relationship, the attorney must accept professional responsibility for the undertaking.  In re Palmieri, 76 N.J. at 58.

The existence of an attorney-client relationship is not precluded by the absence of express assent.  In re Silverman, 113 N.J. 193, 207 (1988).  Courts often infer the existence of an attorney

client relationship when the surrounding circumstances merit such an assumption. See Id. (citing In re Palmieri, 76 N.J. at 58-59).  In the instant matter, although it is clear that there is no retainer or written agreement between Shapiro and Delso, Shapiro acknowledges that he agreed to "informally assist" Delso with legal research and the preparation of written submissions.  Shapiro Opposition at 11.  Delso, relying upon the representation of Shapiro, submitted a Cross Motion for Summary Judgment which Shapiro authored in its entirety, or at the very least, assisted in the drafting of. See Unofficial Transcription of November 3, 2005 Telephone Conference, *supra* at page 7.  Shapiro was aware of and acquiesced to Delso's use of his work product, and certifies that he informed her to be candid with the Court regarding his assistance.  Shapiro Opposition at 12.  As such, this Court deems Delso's actions as an acceptance of Shapiro's proffering of professional services, and therefore the Court can infer, for the purposes of this motion, that an attorney-client relationship exists.

   *2.  Existence of a prior attorney client relationship*

   The Court now turns to the elements of the substantial relationship test.  The first issue to be addressed in a conflict analysis under RPC 1.9(a) is whether a prior attorney client relationship existed.  See e.g. Rohm & Haas Co., 187 F. Supp. 2d at 228.  The parties do not dispute that Shapiro represented the Union from February 1999 through October 2003.  See Shapiro Opposition at 5; Reply Brief at 8.  The Court also notes that Shapiro certifies that his representation was limited to advocating for the Union or individual union members on behalf of the Union in arbitration proceedings.  Shapiro Opposition at 5.  Thus, the Court finds that an attorney client relationship existed between Shapiro and the Union within the meaning of RPC 1.9.

14

### 3.  A Substantial Relationship between the Representations

The Court must determine whether Shapiro's representation[6] of Delso is substantially related to his prior representation of the Union.  "[M]atters are considered substantially related when it can reasonably be said that in the course of the former representation the attorney might have acquired information related to the subject matter of his or her subsequent representation."  Rohm & Haas Co., 187 F. Supp. 2d at 228 (citing Ciba-Geigy Corp. v. Alza Corp., 795 F. Supp. 711, 716 (D.N.J. 1992)(internal quotations omitted)).  "[T]he meaning of 'substantially related' under RPC [1.9(a)] is broadly construed in New Jersey."  Kaselaan & D'Angelo Assoc., Inc. v. D'Angelo, 144 F.R.D. 235, 241 (D.N.J. 1992).  In other words, the existence of a substantial relationship between matters is exhibited by a climate for the disclosure of relevant confidential information due to an adversity between the interests of the attorney's current and former clients.  Reardon, 83 N.J. at 472.

Defendant provides blanket assertions that Shapiro's representation of Delso is substantially related to his representation of the Union, but fails to provide any material support for this position.  See generally Moving Brief at 9-10.  Defendant merely argues that Shapiro's acknowledgment that "he knew that Union members served on the Committee," he understood the Committee's role, and that "he sought information regarding the retirement plan" supports their contention.  Reply Brief at 8.  On the other hand, Shapiro states that there is no substantial relationship between his representation of Delso and the Union, and the Court agrees.  Specifically, Shapiro notes that he has neither represented the Committee, nor is the Union a member of Committee.  Shapiro Opposition at 19.  Additionally, although Fleming was a member of the Committee, he never entered into an attorney-client relationship with Shapiro.  Id.; See RPC 1.13(a) ("A lawyer employed or retained

---

[6] Because the Court has established that an attorney-client relationship was formed between Shapiro and Delso, for purposes of this Opinion the Court shall consider Shapiro's "informal assistance" of Delso as "representation".

15

to represent an organization represents the organization as distinct from its directors, **officers**, employees, members, shareholders or other constituents.")(emphasis added).  The Court also notes that Shapiro's representation of the Union was limited to arbitration proceedings and collective bargaining negotiations, which are wholly unrelated to the Committee's decision making process on Decedent's claim for benefits.  Moreover, Shapiro never received any confidential information regarding the Committee from Fleming.  Shapiro Certification at ¶ 6.

Defendant also notes that at the request of the Union, Shapiro sent correspondence in March 2001 to Merck's Assistant Counsel requesting certain information regarding the application process for disability retirement benefits.  Moving Brief at 4-5.  Merck's counsel advised that any inquiry on behalf on any unnamed plan participants was probably in conflict with Shapiro's representation of the Union.  Id.  Again, the Court finds that this simple exchange of correspondence is not indicative of a substantial relationship between Shapiro's representation of Delso and the Union. The fact that Merck's in-house counsel raised the question of whether Shapiro had a conflict, is immaterial to the instant matter.  Shapiro's effort to obtain information from Merck regarding the application process for disability retirement benefits was simply an extension of his role as an advisor to the Union.  Moreover, Shapiro's inquiry occurred over one year before Mr. Delso's death, and at the very least had no bearing on Delso's application, or any challenge, including Delso's,  to a denial of benefits by the Committee.  Shapiro Opposition at 21-22.  Thus, the Court finds that Shapiro's sending of mere correspondence is not indicative of a substantial relationship between the subject matter of his current and prior representation.

In light of the foregoing, the Court cannot find that a substantial relationship exists between Shapiro's representation of Delso and the Union.  Moreover, there has been no showing by Defendant that as a result of Shapiro's representation, a climate for disclosure of adverse, relevant

confidential information exists.  Defendant has failed to establish a substantial relationship between the current and former representation, and therefore, as a matter of law, no conflict exists under the meaning of RPC 1.7 or 1.9.  See Bagdan, 140 F.R.D. at 668.  Regardless, in the interest of judicial economy, the Court will complete a full analysis of the substantial relationship test, by looking at whether the interests of Delso and the Union are materially adverse.

      *4.  Materially Adverse Interests*

Assuming that Defendants were able to establish a substantial relationship, the lynchpin of this analysis would be whether Shapiro's representation of Delso is materially adverse to his representation of the Union.  When analyzing material adversity, courts often complete an in-depth factual analysis regarding the relationship between the attorneys' current and former clients, as well as the scope of both representations.  For example in Ciba-Geigy Corp. v. Alza Corp., the District Court held a law firm was able to represent a plaintiff in patent infringement litigation, even though the law firm had previously represented one of the defendants in a different patent infringement suit. 795 F. Supp. at 717.  The court reasoned that the current suit addressed a patent for a transdermal nicotine delivery system while the prior suit addressed a patent for a transdermal estradiol delivery system, and therefore the court found that "a qualitative difference exists between the transdermal [patches involved in the different litigations]." Id. at 717-18.  These qualitative differences precluded disqualification.  Id.  The court also noted that the information obtained in the earlier matter would not apply to the later action.  Id. at 714.

The distinctions between Shapiro's representation of the Union and assistance of Delso in the instant matter, are far greater than those presented in Ciba-Geigy Corp. v. Alza Corp.  In fact there is virtually no factual overlap or interplay between the two.  Shapiro has clearly certified that his prior representation was limited to "the union, or, on behalf of the union, individual union

members in arbitration proceedings, ... negotiations on one of the collective bargaining agreements with Merck, in litigation arising from arbitrations, and in a variety of other miscellaneous matters." Shapiro Certification at ¶ 2.  Shapiro also certifies "that the last time I did any work for [the Union] was actually in late October 2003."  Id. at ¶ 3.  On the other hand, the present litigation is a claim for improper denial of lump-sum pension benefits under Section 515(e)(1) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(e)(1).  Complaint at ¶ 1 [Docket Entry No. 1].  Moreover, Shapiro's representation of Delso has been limited to informal assistance "with legal research and with the preparation of written submissions."  Id. at ¶ 18.  Thus, the Court does not find material adversity.

Defendant asserts that Shapiro's assistance of Delso is adverse to the Union, because the Union members "were and continue to be a part of the Committee that rendered a claim determination" on Delso's claim.  Moving Brief at 10-11.  However, there is no attorney-client relationship between Shapiro and the Committee.  Defendant also points out that "several courts have addressed circumstances where, as here, an attorney represents an organization such as a group of ERISA fiduciaries, and thereafter represents a party whose interests are adverse to the interests of the individual members of the group."  Id. at 11 (citing Int'l Longshoremen's Assoc., Local Union 1332 v. Int'l Longshoremen's Assoc., 909 F. Supp. 287 (E.D.Pa. 1995)).  In Int'l Longshoremen's Assoc., an attorney represented the trustees of the union pension committee, including the president of the union, in a prior matter, and the union and same union president were the opposing litigant in the current matter.  Id. at 291-292.  The court reasoned that there was no distinction between the union president acting as a trustee for the retirement fund or as president of the union.  Id. at 287 n.4. In the instant matter, however, Defendant fails to address the significant difference in facts between Int'l Longshoremen's Assoc. and this case.  Specifically, the union president in that matter was a

18

litigant in both cases, first as a defendant trustee, and more recently as a plaintiff.  The attorney was disqualified because he first had an attorney-client relationship with the trustees, including the union president, and more recently developed an attorney-client relationship with an opposing litigant.  These two attorney-client relationships were materially adverse.

In the instant case, Shapiro first represented the Union, including Fleming who was a member of the Committee.  However the scope of Shapiro's representation had nothing to do with the Committee, or Fleming's role on the Committee.  Shapiro never formed an attorney-client relationship with the Committee.  Thus, he cannot be disqualified for material adversity between the interests of Delso and the Committee.  Defendant cites various other cases and claims "the fact that Shapiro represented the Union as a group or organization is inconsequential in determining whether disqualification is warranted."  Moving Brief at 15.  However, Defendant overlooks RPC 1.13(a), which states that "[a] lawyer employed or retained to represent an organization represents the organization as distinct from its directors, officers, employees, members, shareholders or other constituents."  Moreover, each case cited by Defendant contains the same flaw: the attorney represented either the individual or the group they were involved in, who then became subsequent opposing litigants.  Simply put, that situation did not arise in the present case. Cf. Int'l Longshoremen's Assoc., 989 F. Supp. 287; Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co., 1994 WL 62124 (D.N.J. Feb. 23, 1994); Healy v. Axelrod Constr. Co. Defined Benefit Pension Plan & Trust, 155 F.R.D. 615 (N.D.Ill. 1994).  The Court finds no attorney-client relationship between Shapiro and the Committee via his representation of the Union and Fleming's role as Union President.  Therefore, the Court finds that the interests of Shapiro's current and former clients are not materially adverse, and thus there has been no violation of RPC 1.7 or 1.9.

### 5. *Appearance of Impropriety*

In its brief, Defendant asserts that Shapiro should be disqualified because of an "appearance of impropriety." Moving Brief at 10-11. Although this argument appears often in case law, it was eliminated in the 2004 revisions to the RPC as suggested by the New Jersey Supreme Court Commission on the Rules of Professional Conduct (the Pollack Commission). State v. Davis, 366 N.J.Super. 30, 43 (App. Div. 2004). "In agreeing to the elimination of this facet of the Rule, the Supreme Court adopted the Pollock Commission's conclusion that "more objective rules better serve the interests of the bench, bar, and public," and that "the Court's constitutional power over practice and procedure through which the judiciary may control the conduct of attorneys in judicial proceedings" can ensure that the standards of the Bar would not be lowered, and that the public would not be exposed to unethical conduct." Id. (citing Administrative Determinations in Response to the Report and Recommendation of the Supreme Court Commission on the Rules of Professional Conduct, Commission Comment, RPC 1.7).

Although the Pollock Commission noted that the appearance of impropriety doctrine should not be used as the basis for attorney disqualification, it recommended that "a court properly may consider the appearance of impropriety as a factor in determining that ... representation poses an unwarranted risk of disservice either to the public interest or the interest of the client." Id. at 44. In other words, the appearance of impropriety doctrine no longer exists in New Jersey as a determinative factor for discipline under the substantial relationship test and RPC. Rather, the appearance of impropriety doctrine is a fail-safe, to ensure that courts may discipline attorneys even when the RPC's are not violated, if the discipline is in the interest of the public or the client. Id. ("we recognize as the present underpinning of appearance of impropriety concepts the concern that conduct be examined and, in certain circumstances, regulated that is not at odds with the [RPC], but

20

that nonetheless may be contrary to the policies underpinning the Rules.").

The Court does not find any appearance of impropriety under RPC 1.7 or 1.9 in this matter that would violate the public interest, or the interests of Shapiro's present or former clients. Disqualifying Shapiro would neither serve the public interest, nor Delso's. The relationships between Shapiro, Delso, the Union, Fleming and the Committee would be distinguishable by a lay person, and given the information before the Court, it does not appear that these relationships cause any conflicts that would require Shapiro's disqualification under the law. The Court notes that although there are serious issues involved with Shapiro's "informal assistance" of Delso, which shall be discussed momentarily, those issues do not factor into the appearance of impropriety analysis under RPC 1.7 or 1.9.

Defendant has failed to show any violation of RPC 1.7 or 1.9 by Shapiro. Although there are links between Shapiro's representation of the Union and assistance of Delso, they are not materially adverse or substantially related. Therefore, Defendants Motion to Disqualify on these grounds is DENIED.

## B.  Ghostwriting

Defendant asserts that Shapiro should be barred from "informally assisting" or "ghostwriting" for Delso in this matter. The permissibility of ghostwriting is a matter of first impression in this District. In fact, there are relatively few reported cases throughout the Federal Courts that touch on the issue of attorney ghostwriting for *pro se* litigants. Moreover, a nationwide discussion regarding unbundled legal services, including ghostwriting, has only burgeoned within the past decade.

Unbundled legal services, also known as discrete task legal services or limited scope legal assistance, "is a practice in which the lawyer and client agree that the lawyer will provide some, but

21

not all, of the work involved in traditional full service representation." Hon. Fern Fisher-Brandveen & Rochelle Klempner, Unbundled Legal Services: Untying the Bundle in New York State, 29 FORDHAM URB. L. J. 1107, 1108 (2002).  Proponents of unbundled legal services have touted its benefits, including increased access to justice for the poor, efficiency in *pro se* matters, enfranchisement of clients and opportunities for attorneys. Id. at 1107-1114.  However, with these benefits come complex ethical dilemmas for the legal community.  See generally James. M. McCauley, Current Ethical and Unauthorized Practice Issues Relating to Endeavors to Assist Pro Se Litigants, VIRGINIA LAWYER, December 2002, at 43.  The ethics of unbundled legal services is most often questioned when attorneys engage in ghostwriting.  Fisher-Brandveen, 29 FORDHAM URB. L. J. at 1116.

Applying time-tested ethics rules to new unbundled legal services, such as ghostwriting, is extraordinarily difficult because the rules of professional conduct are formulated under the assumption that a client will be provided full-service or traditional representation.   John C. Rothermich, Note, Ethical and Procedural Implications of "Ghostwriting" for pro se litigants: Toward Increased Access to Civil Justice, 67 FORDHAM L. REV. 2687, 2693 (1999).  Proponents claim that "[t]he courts have thrown the book at ghostwriters, and the practice has therefore been chilled."  Jona Goldschmidt, In Defense of Ghostwriting, 29 FORDHAM URB. L. J. 1145, 1147 (2002).  However, courts are duty bound to address ghostwriting within the rubric of existing ethics rules, court rules and professional duties and responsibilities that were drafted and adopted by legislative or governing bodies.  See Hon. Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 COLUM. L. REV. 527, 533 (1947) ("[Courts] are under the constraints imposed by the judicial function in our democratic society...A judge must not rewrite a statute, neither to enlarge it nor contract it.").  Similarly, in the instant matter, the societal benefits of ghostwriting are not

within the Court's purview and shall not be analyzed.  Rather, the Court will determine whether ghostwriting is permissible in this District under the RPC, rules of the Court and relevant case law as they currently exist.

> *1. Undue Advantage*

One of the primary reasons that other courts have found ghostwriting improper is that the *pro se* litigant is given an undue advantage.  Courts generally construe pleadings of *pro se* litigants liberally.  Haines v. Kerner, 404 U.S. 519, 520-21 (1972); U.S. v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  But, "pleadings seemingly filed *pro se* but drafted by an attorney would give [the litigant] the unwarranted advantage of having a liberal pleading standard applied whilst holding the [represented party] to a more demanding scrutiny."  Johnson v. Board of County Commissioners, 868 F. Supp. 1226, 1231 (D.Colo. 1999), aff'd on other grounds, 85 F.3d 489 (10th Cir. 1996).  Moreover, when pleadings "drafted by attorneys are filed bearing the signature of a plaintiff outwardly proceeding *pro se*, the indulgence extended to the *pro se* party has the perverse effect of skewing the playing field rather than leveling it."  Laremont-Lopez v. Southeastern Tidewater Opportunity Center, 968 F. Supp. 1075, 1078 (E.D.Va. 1997).  Courts often extend the leniency given to *pro se* litigants in filing their pleadings to other procedural rules which attorneys are required to follow.  See Bey v. Daimler Chrysler Services of North America, LLC, 2006 WL 1344080 at *5 (D.N.J. May 15, 2006)(stating that "*pro se* plaintiffs are entitled to a certain degree of leniency").  For example, in this District, courts will often accept Motions or briefs from *pro se* litigants when documents such as affidavits, certifications, form of orders or briefs are not included pursuant to L.Civ.R. 7.1.  Lite, N.J. Federal Practice Rules, Comment 3 to L.Civ.R. 10.1 (GANN 2007) ("*Pro se* and prisoner litigants are granted greater leeway in the form of their papers than other parties: where they attempt to file nonconforming papers, the Clerk performs merely a

23

ministerial function, filing the papers and leaving sanctions, if any, to the Court.")(citing Small v. I.R.S., 820 F. Supp. 163 (D.N.J. 1993); Bryen v. Becker, 785 F. Supp. 484, 485 (D.N.J. 1991)). Liberal treatment for *pro se* litigants has also been extended for certain time limitations, service requirements, pleading requirements, submission of otherwise improper sur-reply briefs, failure to submit a statement of uncontested facts pursuant to L.Civ.R. 56.1, and to the review given to stated claims. Ibid. (citing LaMaina v. Brannon, 804 F. Supp. 607, 610 n. 3 (D.N.J. 1992); Mettle v. First Union Nat'l. Bank, 279 F. Supp. 2d 598, 604-605 (D.N.J. 2003); DeJesus Corona v. DeRosa, 325 F. Supp. 2d 516 (D.N.J. 2004); Klagsburn v. Va'ad Harabonim, 53 F. Supp. 2d 732, 742 n. 5 (D.N.J. 1999); Bobian v. CSA Czech Airlines, 222 F. Supp. 2d 598 (D.N.J. 2002), aff'd 93 Fed. Appx. 406 (3d Cir. 2004); Hoffman v. Pressman Toy Corp., 780 F. Supp. 498, 499 (D.N.J. 1990)).

In many of these situations an attorney would not have been given as much latitude by the court. Id. ("attorneys proceeding *pro se* are generally not entitled to the same liberality of treatment as *pro se* laymen")(citing Wein v. Thompson, Inc., 2006 WL 2465220 (D.N.J. August 23, 2006)). Clearly a dilemma arises when the court and adversaries are unaware of "informal assistance" a *pro se* litigant is receiving from an attorney. This dilemma strikes at the heart of our system of justice, to wit, that each matter shall be adjudicated fairly and each party treated as the law requires. Accord Regents of the Univ. of California v. Bakke, 438 U.S. 265, 318 n. 53 (1978)("an underlying assumption of the rule of law is the worthiness of a system of justice based upon fairness to the individual."). Simply stated, courts often act as referees charged with ensuring a fair fight. This becomes an obvious problem when the Court is giving extra latitude to a purported *pro se* litigant who is receiving secret professional help.

In the present case, the Court and Defendant only discovered Shapiro's informal assistance of Delso after the Court questioned Delso during a telephone conference. See Informal

Transcription of the November 3, 2005 Telephone Conference, *supra* at page 7.  Shapiro has certified that he advised Delso to be candid with the Court regarding his representation.  However, on October 11, 2005, Delso filed a cross motion for summary judgment which conformed with the Rules of this Court and which clearly was prepared with the assistance of an attorney. [Docket Entry No. 23-27].  The Court and Defendant were unaware at that time of Shapiro's assistance for the preparation of this motion.  Moreover, it was only approximately one month later, on November 3, 2005, that Delso, as a result of the prodding of Defense Counsel and the Court, revealed Shapiro's involvement in this matter. See Informal Transcription of the November 3, 2005 Telephone Conference, *supra* at page 7.  During the call, Delso simply stated that Shapiro was helping her "fill out her paperwork." Ibid.   In fact, immediately prior to Shapiro's involvement, Delso was granted an extension of time to submit her opposition to Defendant's Motion for Summary Judgment, even though she had previously submitted two letters in opposition.  See Docket Entry Nos. 17 and 20. The Court indulged more delay than would have been acceptable had Delso been represented by counsel.  The District Court never adjudicated the Motions for Summary Judgment, because they were subsequently withdrawn, however, had the Court not discovered Shapiro's assistance, Delso would have had an undue advantage given her *pro se* status.  The Court finds that the resultant misalignment of equality detracts significantly from the administration of justice.

   *2. Violation of Rules and Ethical Concerns*

   "Courts and ethics opinions often cite ghostwriting as a breach of ethical duties and prohibitions concerning deception." Goldschmidt, 29 FORDHAM URB. L. J. at 1159.  This includes the breach of the duties of candor to the Court and fairness to the opposing party, prohibitions against dishonesty, fraud, deceit or misrepresentations, conduct prejudicial to the administration of justice, violation of ethics rules through the act of another, and violations of Fed.R.Civ.P. 11 and

25

various State Ethics Committee Opinions.  Id.  The Court notes that RPC 1.2(c) permits an attorney to "limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent."  RPC 1.2(c).  Nevertheless, the remaining RPC's have been crafted with full service or traditional representation in mind.

### a.  Duty of Candor to the Court

RPC 3.3 defines an attorney's duty of candor to the court, and provides, in relevant part, that:

> (a) A lawyer shall not knowingly,
> (2) fail to disclose a material fact to a tribunal when disclosure is
> necessary to avoid assisting an illegal, criminal or fraudulent act by
> the client; [or]
> (5) fail to disclose to the tribunal a material fact knowing that the
> omission is reasonably certain to mislead the tribunal.

RPC 3.3(a)(1),(5).  New Jersey's courts have held that the duty of disclosure is an affirmative one, and supercedes the attorney's duties to his client.  Itel Containers Int'l Corp. v. Puerto Rico Marine Mgmt, Inc., 108 F.R.D. 96, 104 (D.N.J. 1986); Crispin v. Volkswagenwerk, A.G., 96 N.J. 336 (1984).

The Tenth Circuit Court of Appeals has held that the duty of candor to the court is "particularly significant to ghostwritten pleadings."  Duran v. Carris, 238 F.3d 1268, 1271 (2001) (citing Rothermich, 67 FORDHAM L. REV. at 2697).  The Court continued, "[i]f neither a ghostwriting attorney nor her pro se litigant client disclose the fact that any pleadings ostensibly filed by a self-represented litigant were actually drafted by the attorney, this could itself violate the duty of candor."  Ibid.  Moreover, the sole case in this Circuit addressing ghostwriting held that participation in a ghostwriting arrangement where the attorney drafts the pleadings and the party signs them, "implicates the attorney's duty of candor to the Court".  U.S. v. Eleven Vehicles, 966 F. Supp. 361, 367 (E.D.Pa. 1997).  The Eleven Vehicles Court continued that "[a] lawyer should not

26

silently acquiesce to such representation ... [as these] arrangements interfere with the Court's ability to superintend the conduct of counsel and parties during the litigation" Id.  In other words, ghostwriting is "*ipso facto* lacking in candor." Johnson, 686 F. Supp. at 1232.  Therefore, the Court must determine whether Shapiro's assistance of Delso violated his duty of candor to the Court.

### b.  Fed.R.Civ.P. 11

Many courts have held that ghostwriting of pleadings was violative of Fed.R.Civ.P. 11.  For example the Eastern District of Virginia held that, "[g]hostwriting by an attorney of a *pro se* plaintiff's pleadings has been condemned as both unethical and a deliberate evasion of the responsibilities imposed on attorneys by Federal Rule of Civil Procedure 11." Clarke v. U.S., 955 F. Supp. 593, 598 (E.D.Va. 1997), rev'd on other grounds, 162 F.3d 1156 (4th Cir. 1998) (citing Johnson, 868 F. Supp. at 1231-32).  Other courts have expressed a fear that attorneys would prepare briefs for litigants and would not sign them as required by Fed.R.Civ.P. 11, thereby failing to represent to the court that there is a foundation to support the allegations made. Johnson, 868 F. Supp. at 1231-32 (citing Ellis v. Maine, 448 F.2d 1325, 1328 (1st Cir. 1978)).  One of the earliest cases regarding ghostwriting laid its concern in the enabling of "an attorney to launch an attack against another member of the Bar ... without showing his face." Klein v. Spear, Leeds & Kellogg, 309 F. Supp. 341, 342 (S.D.N.Y. 1970).  Federal Rule of Civil Procedure 11 states that by submitting a signed pleading, motion or other paper to the court,

> an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,
> (1) it is not being presented for any improper purpose ...;
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> (3) the allegations and other factual contentions have evidentiary

> support or, if specifically so identified, are likely to have evidentiary
> support after a reasonable opportunity for further investigation or
> discovery; and
> (4) the denials of factual contentions are warranted on the evidence
> or, if specifically so identified, are reasonably based on a lack of
> information or belief.

Fed.R.Civ.P. 11(b). This District has had Rule 11 in some form since 1937, and "was meant to emphasize attorney responsibility." Hockley by Hockley v. Shan Enterprises Ltd. Partnership, 19 F. Supp. 2d 235, 237 (D.N.J. 1998). Rule 11's purpose of maintaining attorney responsibility continues to exist, despite numerous revisions to the Rule over the years. See generally A.H. v. South Orange Maplewood Bd. of Ed., 153 Fed. Appx. 863 (3d Cir. 2005). Other courts have noted that the application of Rule 11 in a ghostwriting scenario would be difficult. "Even if the Court is able to determine who is responsible for drafting the complaints, the additional inquiry necessitated by the lawyers' failure to sign the pleadings interferes with the just, speedy, and inexpensive determination of those actions." Laremont-Lopez, 968 F. Supp. at 1078 (internal quotations omitted). However, proponents of ghostwriting claim that "a ghostwriter attorney may be hauled into court, under Rule 11 or the inherent power of the court, and be subject to sanctions." Goldschmidt, 29 Fordham Urb. L. J. at 1174. Regardless, there are complex issues that arise when considering whether a ghostwriting attorney is subject to the requirements of Rule 11.

Moreover, this Court's L.Civ.R. 11.1 mandates that each attorney of record shall personally sign all papers submitted to the Court or filed with the Clerk. L.Civ.R. 11.1. The spirit of L.Civ.R. 11.1 is similar to that of its Federal Rule counterpart, to ensure attorney responsibility before the court. See e.g. Zdrok v. V Secret Catalogue, Inc., 215 F. Supp. 2d 510, 517-519 (D.N.J. 2002); Lite, N.J. Federal Practice Rules, Comment 2 to L.Civ.R. 11.1 (GANN 2007). Thus, the Court finds that although undisclosed ghostwriting may not per se violate Fed.R.Civ.P. 11 and L.Civ.R. 11.1,

it clearly violates the intention that attorneys be responsible for their submissions to the Court.

### 3. Public Policy

Scholars and commentators from around the country have authored numerous articles highlighting the societal benefits of unbundled legal services, including ghostwriting.  See e.g. Goldschmidt, 29 FORDHAM URB. L. J. 1145;  Rothermich, 67 FORDHAM L. REV. at 2710-15;  Fisher-Brandveen, 29 FORDHAM URB. L. J. at 1121-24;  Paula L. Hannaford-Agor, Helping the Pro Se Litigant: A Changing Landscape, CT. REV.: J. AM. JJ. ASSOC., Winter 2003, at 8; ABA Standing Committee on the Delivery of Legal Services, An Analysis of Rules that Enable Lawyers to Serve Pro Se Litigants, A White Paper, April 2005, available at www.abanet.org/legalservices/downloads/delivery/prosewhitepaperfeb2005.pdf; N.Y. State Bar Assoc. Comm. on Providing Access to Legal Services for Middle Income Consumers, Report and Recommendations on "Unbundled" Legal Services, December 2002, available at www.nysba.org/Content/ContentGroups/News1/Reports3/middleincomereport.pdf.  On the other hand, certain Courts have expressed a practical concern with the practice of ghostwriting.  In Olvera v. Edmundson, the court held that, "[w]hile not an unethical practice, the court notes that ghostwriting does little for the judicial process, inasmuch as *pro se* litigants are ill equipped to prosecute the complex issues raised without continued legal assistance." 2001 WL 1019385 at * 1 n.1 (W.D.N.C. June 15, 2001).  Despite these extensive analyses of public benefit, the Court may only look to the present state of the law and rules.  This is not to say that this Court does not believe that unbundled legal services, in some form, may be beneficial to the equal administration of justice.  But, when viewed under the current RPC, ghostwriting is antithetical to the public interest.

*4.  Conclusion*

Ultimately the sole question before this Court is whether Shapiro's ghostwriting activity violated any of his ethical obligations as a member of the Bar.  Despite his good intentions and instructions that Delso be candid with the Court regarding his role, this Court finds that it did.  It is clear to the Court that Shapiro's "informal assistance" of Delso fits the precise description of ghostwriting.  The Court has also determined that undisclosed ghostwriting is not permissible under the current form of the RPC in New Jersey.  Although the RPC's are restrictive, in that they assume traditional full service representation, all members of the Bar have an obligation to abide by them. In this matter, Shapiro's ghostwriting was not affirmatively disclosed by himself or Delso.  Delso's Cross Motion for Summary Judgment, on which Shapiro assisted, was submitted to the Court without any representation that it was drafted, or at least researched, by an attorney.  Thus, for the aforementioned reasons the Court finds that undisclosed ghostwriting of submissions to the Court would result in an undue advantage to the purportedly *pro se* litigant.  Accord Johnson, 868 F. Supp. at 1231; Laremont-Lopez, 968 F. Supp. at 1078.

Although RPC 1.2(c) allows limited scope representation, the Court finds that undisclosed ghostwriting will often violate ethical duties outlined in the RPC.  In the instant matter, the Court finds that Shapiro also violated his duty of candor to the Court.  See RPC 3.3.  For our judicial system to maintain the highest level of integrity, officers of the court must be held to the highest ethical standards.  Although the Court does not believe that Shapiro's violations were wilful, his failure to affirmatively advise the Court of his informal assistance of Delso, and Delso's subsequent submission to the Court under her own signature was not emblematic of the candid honesty contemplated by the RPC 3.3.  Accord Duran, 238 F.3d at 1272 ("We determine that the situation as presented here constitutes a misrepresentation to this court by litigant and attorney.")(citing

30

Johnson, 868 F. Supp. at 1231-32).  Simply advising Delso to notify the Court of his role did not

fulfil Shapiro's obligations as an officer of the Court.

The Court further finds that the undisclosed ghostwriting and submission of ghostwritten

papers to the Court did not *per se* violate Fed.R.Civ.P. 11 or L.Civ.R. 11.1, but did contravene the

spirit of those Rules.  Fed.R.Civ.P. 11 and L.Civ.R. 11.1 have been put in place to emphasize the

personal responsibility that attorneys have to the Court.  See Hockley by Hockley, 19 F. Supp. 2d

at 237.  By failing to affirmatively advise the Court of his assistance of Delso, and by permitting

Delso to submit ghostwritten briefing to the Court under her own name, Shapiro failed to certify

documentation that he prepared that was submitted to the Court and violated the spirit of the Rules.

See Laremont-Lopez, 968 F. Supp. at 1078.

For the aforementioned reasons the Court finds that undisclosed ghostwriting of briefing and

other submissions to the Court is improper under New Jersey's RPC and the Rules of this Court.

The Court notes that only after New Jersey adopts revisions to the RPC to allow for the regulation

of unbundled legal services, if at all, will their use be acceptable in situations such as the one before

the Court.  See generally  The Rules of Professional Conduct of CA, CO, FL, ME, NV, WA and

WY; See also Mass. Limited Assistance Representation Pilot Program.[7]  The Court further finds that

Shapiro's ghostwriting activity violated the RPC, the spirit of Fed.R.Civ.P. 11 and L.Civ.R. 11.1,

as well as public policy.

---

[7]    Available at  www.mass.gov/courts/courtsandjudges/courts/supremejudicialcourt/order
limitedreppilotproject.pdf.

### III.  CONCLUSION

Defendant failed to meet its burden to show an exchange of information between Shapiro and Fleming, or each element of the substantial relationship test, and thus its motion in that regard must fail.  Moreover, although the Court finds that Shapiro's undisclosed ghostwriting is not permissible under the RPC, It hesitates to disqualify Shapiro for these violations, as no concurrent or successive conflict of interest exists.

THEREFORE, IT IS on this 5th day of March, 2007,

ORDERED that Defendant's Motion to Disqualify Shapiro is DENIED; and it is further

ORDERED that Defendant's Motion to Bar Shapiro from informally assisting or ghostwriting for Delso is GRANTED; and it is further

ORDERED that Shapiro shall either enter an appearance to fully represent Delso as counsel of record in this matter, or cease communication with and assistance of Delso in this matter; and it is further

ORDERED that if Shapiro chooses to represent Delso, he must enter an appearance no later than **March 30, 2007**; and it is further

ORDERED that the Clerk of the Court terminate this Motion [Docket Entry No. 42] accordingly.

    **s/   Tonianne J. Bongiovanni**
**HONORABLE TONIANNE J. BONGIOVANNI**
**UNITED STATES MAGISTRATE JUDGE**